**In re ZENITH ELECTRONICS CORPORATION, a Delaware corporation, Debtor.**

**Bankruptcy No. 99–2911 (MFW).**

United States Bankruptcy Court, D. Delaware.

Nov. 2, 1999.

Laura Davis Jones, Young Conaway Stargatt & Taylor, Wilmington, DE, James H.M. Sprayregen, Kirkland & Ellis, Chicago, IL, for Debtors.

Norman L. Pernick, Esquire, Saul Ewing Remick & Saul, Wilmington, Jeff L. Marwil, Katten Muchin & Zavis, Chicago, IL, for Equity Committee.

Thomas L. Ambro, Richards Layton & Finger, Wilmington, DE, for LG Electronics.

Laurie Selber Silverstein, Potter Anderson & Corroon, Wilmington, DE, for Special Committee of Board of Directors.

Francis A. Monaco, Jr., Walsh Monzack & Monaco, Wilmington, DE, for State Street Bank & Trust.

John D. McLaughlin, Jr., Office of the United States Trustee, Philadelphia, PA.

Cindy Davis, Paul Hastings Janofsky & Walker, New York City, Jesse H. Austin, III, Paul Hastings Janofsky & Walker, Atlanta, GA, for Citicorp North America, Inc.

Faye B. Feinstein, Altheimer & Grey, Chicago, IL, for Hitachi Home Electronics (America), Inc. and Nissei Sangyo America, Ltd.

Lawrence Nyhan, Sidley & Austin, Chicago, IL, for Independent Directors.

Susan R. Sherrill, Securities & Exchange Commission, Atlanta, GA.

William H. Sudell, Jr., Morris Nichols Arsht & Tunnell, Wilmington, DE, for Ad Hoc Committee of Bondholders.

Ronald J. Silverman, Bingham Dana, Hartford, CT, for Ad Hoc Committee of Bondholders.

Jeffrey M. Schlerf, The Bayard Firm, Wilmington, DE, for Nordhoff Investments, Inc.

## OPINION

MARY F. WALRATH, Bankruptcy Judge.

This case is before the Court on the request of Zenith Electronics Corporation ("Zenith") for approval of its Disclosure Statement and confirmation of its Pre-Packaged Plan of Reorganization filed August 24, 1999 ("the Plan"). The Plan is supported by Zenith's largest shareholder and creditor, LG Electronics, Inc. ("LGE"), and the holders of a majority of the debentures issued by Zenith pre-petition ("the Bondholders").[1] The Plan is opposed by the Official Committee of Equity Security Holders ("the Equity Committee") and numerous shareholders, including Nordhoff Investments, Inc. ("Nordhoff")(collectively, "the Objectors"). For the reasons set forth below, we overrule the objections, approve the Disclosure Statement and will confirm the Plan, if modified in accordance with this Opinion.

## I. FACTUAL BACKGROUND

Zenith has been in business for over 80 years. It was a leader in the design, manufacturing, and marketing of consumer electronics for many years. In recent years it has experienced substantial financial difficulties. It incurred losses in 12 of the last 13 years.

In 1995 Zenith persuaded one of its shareholders, LGE which held approximately 5% of its stock, to invest over $366 million in acquiring a total 57.7% stake in the company. Notwithstanding that investment, and loans and credit support in excess of $340 million provided subsequently by LGE, Zenith's financial condition continued to deteriorate. Zenith suffered net losses in 1996 of $178 million, in

---

1. An ad hoc committee of the Bondholders was formed pre-petition which included Loomis Sayles & Company, L.P., Mariner Investment Group, Inc., and Caspian Capital Partners, L.L.P. ("the Bondholders' Committee").

1997 of $299 million and in 1998 of $275 million.

In late 1997, the Asian financial crisis and the continuing losses at Zenith, caused LGE (and Zenith) to question LGE's ability to continue to support Zenith and Zenith's need to reorganize. LGE retained McKinsey & Co. ("McKinsey") to evaluate its investment in Zenith and to suggest improvements Zenith could make in its operations and focus. Zenith hired an investment banking firm, Peter J. Solomon Company ("PJSC") in December, 1997,[2] and a new CEO, Jeff Gannon, in January 1998. Under Mr. Gannon, Zenith made substantial operational changes, including a conversion from manufacturer to a marketing and distribution company which outsourced all manufacturing. Zenith's manufacturing facilities were sold or closed in 1998 and 1999. While those operational changes did have some effect on stemming the losses, they were insufficient to eliminate them.[3] Contemporaneously, PJSC evaluated Zenith's assets on a liquidation and going concern basis.

In early 1998, Zenith also attempted to attract a strategic investor or purchaser of part or all of its business or assets. Because of its financial condition, Zenith was advised that it could not raise money through the issuance of more stock or debt instruments. Zenith's strategy was to identify companies which might have an interest and then to have Zenith's CEO approach the target's CEO to discuss the possibilities. Several meetings were conducted with such entities.[4] No offers were received for a sale of substantial assets or business divisions; nor were any offers of equity investments received.[5]

In April 1998, LGE proposed a possible restructuring of its debt and equity in Zenith, contingent on substantial reduction of the bond debt and elimination of the shareholder interests. Zenith appointed a Special Committee of its Board of Directors to evaluate the restructuring proposal and to conduct negotiations on behalf of Zenith. After agreement was reached with the Special Committee, negotiations proceeded with the Bondholders' Committee. Ultimately the restructuring proposal was reduced to a pre-packaged plan of reorganization.

A Disclosure Statement and Proxy Statement–Prospectus for the solicitation of votes on the Plan was prepared and reviewed by the SEC. Discussions with the SEC over the requirements of the Disclosure Statement started in August 1998. On July 15, 1999, after numerous revisions, the SEC declared the Disclosure Statement effective. On July 20, 1999, Zenith mailed the Plan and Disclosure Statement to the Bondholders and others entitled to vote on the Plan. After voting was completed on August 20, 1999, the Bondholders had voted in favor of the Plan by 98.6% in amount and 97.01% in number of those voting. LGE and Citibank, a secured creditor, had also voted to accept the Plan. Zenith immediately filed its chapter 11 petition on August 24, 1999. At the same time, Zenith filed its Plan and Disclosure Statement and sought prompt approval of both. A combined Disclosure Statement and confirmation hearing was scheduled for September 27 and 28, 1999.

An ad hoc committee of minority shareholders sought a postponement of the confirmation hearing, which was denied. We did, however, grant its motion for appoint-

---

**2.** The circumstances surrounding PJSC's retention are discussed in more detail in Part B1, below.

**3.** Net losses as of August, 1999, were $58.8 million showing some improvement as a result of Zenith's operational changes.

**4.** For example, Mr. Gannon met with representatives of Microsoft, Intel, General Instru-

ment, Hitachi, Philips, RCA/Thompson, Sony, Sun Microsystems and Texas Instruments. Several other companies were contacted, but none expressed sufficient interest to warrant a meeting.

**5.** Although discussions are ongoing with at least one entity, those discussions do not appear to be a viable alternative to the Plan.

ment of an official committee of equity holders, over the objection of Zenith, LGE and the Bondholders' Committee. We did so to give the equity holders an opportunity to conduct discovery and present their arguments against confirmation of the Plan.

The combined Disclosure Statement and confirmation hearing was held on September 27 and 28, 1999. Post trial briefs were filed by the parties on October 4, 1999.

## II. DISCUSSION

As an initial matter, the Equity Committee objects to the adequacy of the Disclosure Statement, asserting that it failed to advise those voting on the Plan of numerous "essential facts" including (1) that LGE had hired PJSC, thus tainting the valuation of Zenith done by PJSC, (2) that different entities had done different analyses of the value of Zenith, including McKinsey, and (3) that alternatives to the Plan had been analyzed but the results not revealed. Zenith, LGE and the Bondholders' Committee all dispute the Equity Committee's contentions.

In their objections to confirmation of the Plan, the Equity Committee and Nordhoff raise several issues: (1) whether the valuation of Zenith, upon which the Plan is premised, is fatally flawed; (2) whether the Plan is fair and equitable to minority shareholders; and (3) whether the Plan is proposed in good faith by Zenith (and by LGE) and not by any means forbidden by law.

### A. Approval of the Disclosure Statement

Typically, under chapter 11 of the Bankruptcy Code, the court approves the debtor's disclosure statement before it, and the plan of reorganization, are sent to creditors and others entitled to vote on the plan. Section 1125(b) provides:

(b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title

from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b). See also, Fed. R. Bankr.P. 3017 & 3018.

However, Congress recognized the validity of votes solicited pre-bankruptcy (a practice which had developed under chapter X of the Bankruptcy Act). Section 1126(b) provides:

(b) For the purposes of subsections (c) and (d) of this section, a holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if—

(1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or

(2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title.

11 U.S.C. § 1126(b).

Zenith asserts that the Disclosure Statement meets both criteria. We agree.

### 1. Standing

■ Zenith asserts as a threshold issue that the Equity Committee does not have standing to object to the Disclosure Statement. Under the Plan, equity holders are receiving nothing. (See Plan at Article III B8 (Class 7).) Therefore, the equity holders are conclusively presumed to have rejected the Plan and do not have the right to vote. 11 U.S.C. § 1126(g).

Since the Disclosure Statement need only contain adequate information for those entitled to vote, some courts have concluded that non-voting classes have no standing to be heard on the issue. *See, e.g., In re Scioto Valley Mortgage Co.,* 88 B.R. 168, 171 (Bankr.S.D.Ohio 1988)(creditor only has standing to object to adequacy of disclosure statement as to its own class and not as it affects any other class).

However, the Equity Committee, as an official committee in this case, does have standing to appear and be heard on any issue in the case. 11 U.S.C. § 1109(b). Thus, we conclude that it has standing to object to the Disclosure Statement.[6]

### 2. *Approval by the SEC*

■ Zenith asserts that the adequacy of its Disclosure Statement is governed by section 1126(b), not section 1125. *See, e.g., In re The Southland Corp.,* 124 B.R. 211, 223 (Bankr.N.D.Tex.1991) (where votes are solicited pre-petition, section 1126(b) applies unless there is no applicable non-bankruptcy law dealing with the adequacy of disclosure issue).

In this case, the SEC was required to approve the Disclosure Statement because the Plan provides for the issuance of new securities to the Bondholders. The SEC did approve the Disclosure Statement on July 15, 1999, as containing adequate information (after 11 months of discussions and numerous amendments).[7]

We conclude that the Disclosure Statement, having been approved by the SEC as containing adequate information, complies with the provisions of section 1126(b)(1).

### 3. *Adequacy of information*

■ Even if it did not fit the provisions of section 1126(b)(1), the Disclosure Statement does contain sufficient information to comply with section 1126(b)(2) and 1125(a). The Disclosure Statement is almost 400 pages. It contains numerous financial statements and historical information about Zenith. It has lengthy descriptions of Zenith's efforts to restructure its operations and finances and alternatives to the proposed Plan. It describes LGE's relationship to Zenith. It provides valuation information and a liquidation analysis.

Further, Zenith is a public company. Consequently, substantial information about its finances and operations is publicly available. It files periodic statements with the SEC, and media attention to its plight has been intense.

■ In considering the adequacy of a disclosure statement, it is important to keep in mind the audience. Here, those entitled to vote on the Plan are sophisticated, institutional investors. They have competent professionals assisting them in analyzing and testing the information provided by Zenith. They have also been involved in negotiations with Zenith and LGE for over a year before voting on the Plan. Significant documents and information (in addition to the Disclosure Statement) were made available to the Bondholders' Committee and its professionals during that time.

Finally, there is no suggestion that the Disclosure Statement contains false information—only that certain additional information was not included. What the Equity Committee asserts is missing, however, is not uncontested, concrete facts, but rather the Equity Committee's interpretation of those facts or duplicative informa-

---

**6.** We do, however, consider it significant that, even after the Equity Committee objected to the adequacy of the Disclosure Statement, the Bondholders and other creditors who were entitled to vote did not dispute the accuracy of the Disclosure Statement and continued to support the Plan and the process by which votes were solicited.

**7.** Many of the objections stated by the Equity Committee to the adequacy of disclosure by Zenith were raised in a letter to the SEC in June 1999 from one of the members of the Equity Committee. (*See* Exh. Z–43.)

tion.[8] We do not believe that such "information" must be included in the Disclosure Statement.

Given the sophistication of the parties, the wealth of information contained in the Disclosure Statement and publicly available elsewhere, the approval by the SEC and the lack of objection by any party entitled to vote on the Plan, we readily conclude that the Disclosure Statement contains adequate information and the votes solicited by it are valid. The Disclosure Statement will be approved, pursuant to section 1126(b) and/or 1125(a).

### B. *Confirmation of the Plan*

The Plan is premised on a valuation prepared by PJSC. The Objectors raised, as a preliminary issue, the disinterestedness of PJSC. This was raised both by an objection to the retention of PJSC by Zenith and by attacking the credibility of PJSC's testimony at the confirmation hearing. Because it may affect our assessment of the valuation testimony presented, we address the disinterestedness issue first.

### 1. *Disinterestedness of PJSC*

The basis for the allegation that PJSC is not disinterested (and that its valuation testimony is not credible) is the fact that before PJSC was hired by Zenith it was interviewed by LGE which decided to hire PJSC for itself. The underlying facts are largely uncontested.

On November 28, 1997, LGE interviewed firms with the intention of hiring an investment banker to assist LGE in determining the value of Zenith and whether LGE should continue its investment in Zenith. One of those firms was PJSC. At the conclusion of the interview, both PJSC and LGE testified, LGE decided to hire PJSC. Between November 28 and December 3, 1997, PJSC spent a substantial amount of time working on the engagement. This effort included preparing a draft engagement letter and numerous telephone calls with LGE's representatives. Those efforts were largely consumed in PJSC's compilation of information about Zenith and LGE's investment in it to permit PJSC to advise LGE about whether to continue to support Zenith (including a possible loan or equity investment to permit Zenith to make a $25 million interest payment due to the Bondholders in December 1997).

After extensive "fact-finding" efforts over the weekend, PJSC met with LGE on December 2, 1997, to prepare for Zenith's Board of Directors meeting scheduled for the next day. At the December 2 meeting PJSC and LGE discussed a memorandum which LGE's Ian Woods had prepared (with input from PJSC) regarding the strategy LGE should take with respect to Zenith. (*See* Exh. E–12 attached to the Equity Committee's Objection to Confirmation.)

The next day, December 3, PJSC went to the Zenith Board of Directors meeting with LGE. It was at that meeting that Zenith's Board decided that it, rather than LGE, should hire PJSC. The Board asked PJSC whether it had a conflict or felt it could represent Zenith. PJSC said it had no conflict, because the engagement letter sent to LGE had not been executed. Since that time PJSC has been representing Zenith.[9]

### a. *Retention under section 327(a)*

■ When Zenith filed its petition under chapter 11 on August 24, 1999, it sought authority at the same time to retain PJSC pursuant to section 327(a). The Equity Committee objected to the retention on the grounds that PJSC is not disinterested.

Section 327(a) states:

---

8. For example, neither LGE nor the Bondholders' Committee were required to include its analysis of the value of Zenith's assets in Zenith's Disclosure Statement. Zenith included its own, performed by PJSC, and that was sufficient.

9. The Equity Committee concedes this point. (Post Trial Memorandum at p. 5, n. 4.)

(a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a).

█ Where there is an actual conflict of interest, the professional may not be retained by the debtor or trustee. *See In re Marvel Entertainment Group,* 140 F.3d 463, 476 (3d Cir.1998); *In re BH & P, Inc.,* 949 F.2d 1300, 1315 (3d Cir.1991).

The Third Circuit has clearly set forth the standards which the Court must apply in considering retention of professionals by the Debtor:

> We previously interpreted the standards applicable to employment of trustee's counsel under §§ 327(a) and 101(14)(E) in *BH & P,* 949 F.2d 1300. Insofar as both parties have somewhat misread *BH & P,* and urge upon us such conflicting interpretations of it, we have studied our previous decision in great detail and today expressly reiterate its holding: (1) Section 327(a), as well as § 327(c), imposes a per se disqualification as trustee's counsel of any attorney who has an actual conflict of interest; (2) the district court may within its discretion—pursuant to § 327(a) and consistent with § 327(c)—disqualify an attorney who has a potential conflict of interest and (3) the district court may not disqualify an attorney on the appearance of conflict alone.

*Marvel,* 140 F.3d at 476.

We conclude that PJSC has an actual conflict of interest barring its retention.

PJSC was, in fact, retained by LGE in connection with its investment in Zenith. At the conclusion of the interview on November 28, both LGE and PJSC orally agreed that PJSC would work for LGE—a written document was prepared confirming this. The fact that the engagement letter was not signed is irrelevant; the parties' actions confirm that they were acting in accordance with an oral retention. For the next five days, PJSC did extensive work on this engagement and had numerous, confidential conversations with LGE.

PJSC's retention by LGE (a shareholder and creditor of Zenith) in connection with LGE's investment in Zenith creates a direct and actual conflict of interest, barring PJSC's retention by Zenith in this bankruptcy case.[10] It is irrelevant that the retention was two years ago or that it only lasted for five days. It creates an insurmountable barrier to PJSC's retention by Zenith in this case. In this respect, the instant case differs from *Marvel,* where the Third Circuit concluded that there was not an actual or potential conflict because "[t]he Firm has never represented [the creditor] on a matter related to this bankruptcy." 140 F.3d at 477. Here, PJSC did represent LGE in connection with Zenith; this is an actual conflict.

Zenith argues that section 327(c) provides a safe haven for the retention of PJSC. That section provides that· "a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is an objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest." 11 U.S.C. § 327(c). In this case there is an objection[11] and we

---

**10.** That the conflict would not bar retention, or is waivable, in a nonbankruptcy context is not relevant. *See, e.g., United States Trustee v. Price Waterhouse,* 19 F.3d 138, 141 (3d Cir.1994)(actual conflict of interest cannot be waived and bars retention under section 327).

**11.** We conclude that the Equity Committee has standing under section 1109(b) to object

find that PJSC, having represented the majority shareholder and single largest creditor of Zenith in connection with its claims against Zenith, has an actual conflict of interest and may not be retained by Zenith in this bankruptcy case.

### b. *Disqualification as Witness*

■ However, the fact that PJSC is not eligible to be retained by Zenith under section 327(a) does not mean that its testimony must be stricken. There is no requirement of disinterestedness before one can testify in favor of confirmation of a debtor's plan. (For example, the testimony of John Koo, the Chief Executive Officer of LGE, was also presented at the confirmation hearing in support of the Plan.) Thus, PJSC is not disqualified from testifying.

■ Nor is PJSC's testimony "tainted" by its prior representation of LGE, which was extremely limited (two years ago for five days) compared to PJSC's extensive work for Zenith since then. Despite the Equity Committee's suggestion, we find no evidence that LGE exerted any undue pressure on PJSC or that PJSC altered its recommendations or conclusions because of LGE. We conclude on the record before us that PJSC has represented Zenith alone since December 3, 1997.

The Equity Committee also asserts that PJSC should be barred from testifying because under the terms of its pre-petition engagement letter with Zenith, it is entitled to a success fee if the Plan is confirmed.[12] This, the Equity Committee asserts, taints its testimony. We disagree. As Zenith notes in its response, PJSC's engagement by Zenith since December 1997 was for a substantial array of services: investment banking advice, financial analysis, operational restructuring, marketing, as well as valuation analysis. The "success fee" was not offered for its testimony at the confirmation hearing.

■ In addition, many retention agreements with investment bankers, financial advisors (and even counsel) contain such contingent fee arrangements. That does not, per se, disqualify such firm from testifying as an expert witness.[13] *See, e.g., Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp.*, 546 F.2d 530 (3d Cir.1976)(testimony of attorney for defendants as expert not excluded although representation of a party and lack of expertise in mechanical engineering made it error for court to rely exclusively on that testimony); *Creative Dimensions in Management, Inc. v. Thomas Group, Inc.*, 1999 WL 135155 (E.D.Pa. March 11, 1999) (fact witness with contingent agreement with plaintiff not disqualified from testifying).

The Third Circuit in *Universal Athletic* stated that

> [I]t is well settled that a lawyer is competent to testify on behalf of his client. Of course, such testimony may subject the attorney to separate disciplinary action. Thus, while we do not approve of the practice of an attorney testifying as an expert witness for a client of his law firm, certainly in the absence of some necessity for such testimony, we cannot say that the district court committed error solely by not extirpating that testimony. In so concluding, we are in accord with the courts of appeals in several other courts.

to PJSC's employment under section 327(c).

12. Because PJSC is not eligible for retention by Zenith under section 327, it may not be compensated by the estate for any post-petition work. However, to the extent the pre-petition engagement by Zenith entitles it to a success fee, that contract may be enforceable, if not rejected under section 365 or altered by the Plan.

13. Zenith also noted that one of the Equity Committee's experts had an agreement with the Committee entitling him to a success fee if the Plan were not confirmed and he were able to sell the company. There was no objection to his testimony.

546 F.2d at 539 (citations omitted). Similarly, we conclude that PJSC is not disqualified from testifying because of its contingent fee arrangement with Zenith.

■■■ The Equity Committee also objects to PJSC's qualifications as an expert in the areas on which it has been called to testify. *See, e.g., Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (trial court must ascertain that expert scientific testimony is reliable and relevant before permitting expert to testify); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999) (court must apply *Daubert* scrutiny to all expert testimony). At the confirmation hearing, the Committee was afforded the opportunity to conduct voir dire of the experts offered by the Plan proponents. After doing so, we concluded that PJSC's qualifications were sufficient to permit their testimony. The experts' testimony on valuation was founded on well-accepted methodologies and on evidence and reports prepared by other experts in the field, on which valuation experts would normally rely. In fact, those methodologies (the capital asset pricing model and discounted cash flow analysis) and the market reports (of trends in the industry for adoption of Zenith's technology) were also relied upon by Ernst & Young ("E & Y"), the experts offered by the Equity Committee. We, therefore, find PJSC's testimony to be relevant and reliable.

### 2. *The value of Zenith*

■■■ The valuation issue in this case is somewhat unique. It is not presented in connection with determining whether the Plan complies with section 1129(a)(7): the

Equity Committee concedes that on a liquidation under chapter 7 the shareholders will receive nothing. PJSC estimates the liquidation value of Zenith at $170 million; creditors' claims exceed $545 million.[14]

The value of Zenith as a going concern is, however, disputed and is relevant to the issues of whether the Plan is fair and equitable and proposed in good faith. (*See* discussion at Parts B3 and B4, *infra.*)

PJSC values Zenith as a going concern at $310 million, while the Equity Committee's experts value it at $1.05 billion.[15] The significant difference in the experts' conclusions is the value attributed to the VSB technology developed by Zenith ($155 million according to PJSC, $833 million according to E & Y).[16]

The VSB technology is (or will be) used for the transmission of digital television signals via airwaves ("terrestrial broadcast") as opposed to cable or satellite transmission. The FCC has determined that the VSB technology (which is patented by Zenith) will be the standard for terrestrial broadcast. However, terrestrial broadcast only accounted for approximately 25.7% of the television market in the United States in 1997 and its market share is projected to fall to 14% by 2007. (Cable represented 66.7% of the market in 1997 and satellite represented 7.5%). (*See* Exh. E–16, p.25 attached to the Equity Committee's Objection to the Plan.) No standard has been set in most of the rest of the world and VSB is competing with other technology, most notably COFDM.

Digital televisions are being manufactured but, because digital transmission is not currently available, the market is still new. The cost of the products is high and the demand is low. However, because the

---

**14.** This is without consideration of current assets and current liabilities which essentially offset each other.

**15.** Again, both valuations exclude current assets and current liabilities.

**16.** The experts used essentially the same methodology to calculate the value of Zenith's

consumer electronics business and tuner technology. Their values are not significantly different: PJSC values the consumer electronics business at $95 million; E & Y values it at $150 million. PJSC values the tuner technology at $60 million; E & Y values it at $62.6 million.

FCC has picked VSB as the standard and digital transmission will be required in the future, the value of Zenith's VSB technology is significantly more than current sales.[17] It is because of this that both experts' valuations are, of necessity, speculative.

Both parties' experts used the discounted cash flow method to value the VSB technology. They relied on the same industry experts' reports on the acceptance rates of the technology and the size of the domestic and foreign markets to calculate expected future sales.

PJSC's valuation uses a discount rate for the domestic market of 25%, which was selected from the middle of the range of rates for venture funds and hedge funds. Further, PJSC compared risk inherent in the VSB technology to start-up biotech firms, which have a new product near regulatory approval but without any established sales. For the foreign markets, PJSC used discount rates of 40% and 55%, to reflect the additional risks inherent in whether the country had adopted, or was likely to adopt, the VSB standard.[18]

In contrast, the Equity Committee's valuation expert from E & Y used a discount rate of 17% for the domestic market (with adjustments similar to PJSC's for the foreign market). E & Y also used the capital asset pricing model to determine that discount rate, but selected different companies for comparison. The Plan proponents believe the E & Y discount rate is grossly understated, noting that its discount rate is the same as Microsoft's.

17. Apparently, Zenith has not yet licensed its VSB technology to anyone or collected any royalties.

18. Subsequent to the PJSC valuation report, China and India had apparently moved from the "likely to adopt" category to the "not likely to adopt" category. PJSC's valuation may be too high as a result.

19. There is already apparently a movement to convince the FCC to change the standard.

We agree with the conclusion of PJSC that the discount rate for Zenith is more appropriately 25% than 17%. Zenith, although an established company in the consumer electronics industry, has clearly not been a leader in recent years. It is no Microsoft and no source of capital would view it as such. In fact, its inability to raise capital, at any rate, is one of the reasons it is in chapter 11 today. Further, the technology being assessed is new and untried in the market. There are significant risks inherent in its future: the risk that the FCC may change its decision on the standard for terrestrial broadcast,[19] the risk that consumers may not embrace the new technology, the certainty that revenues will not be significant until digital is being broadcast and the products incorporating that technology are readily available and cheaper. We conclude that PJSC properly assessed the risk inherent in this technology by comparing it to hedge funds and biotech companies.

The other significant difference in the valuations of the two experts is the royalty rate which Zenith will be able to charge for use of the technology. PJSC (and Zenith itself) assert that Zenith can charge only $5 per unit while E & Y asserts that it can charge a percentage of each unit's sale price (4.5%). We agree with Zenith that the percentage royalty rate is faulty.

Zenith has consistently projected royalty rates of $3 to $7 per unit. When Zenith retained Price Warehouse (in 1997, before the restructuring began) to evaluate the VSB business, Price Waterhouse concluded that $5 per unit was reasonable.[20] (See Exh. Z–18.) Zenith's conclusion that a flat

20. While the Equity Committee asserts that Price Waterhouse's conclusion was dictated by Zenith which made Price Waterhouse change its rate from a percentage to a fixed dollar per unit rate, we conclude that Price Waterhouse did so based on Zenith's more extensive knowledge of the appropriate structure for royalty rates in its industry.

fee is appropriate is also supported by the market. In this industry, royalty rates are typically flat rates, not percentage rates. The direct competitor for VSB technology in the European market (COFDM) is also priced as a flat fee ($3.50 per unit). In contrast, E & Y relied on comparables that are not even in this industry. (*See* pp. 6–7 and attachment 3 to E & Y Royalty Rate Report.) Therefore, we agree with Zenith's (and PJSC's) conclusion that a flat fee royalty of $5 per unit is appropriate rather than a percentage rate.

We conclude that the total value of the VSB technology, as determined by PJSC, is reliable. We, therefore, accept its conclusion that the value of Zenith as a going concern is $310 million. Consequently, we conclude that there is no equity in the company, even on a going concern basis.

### 3. *Fair and Equitable*

■ Where a class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it "does not discriminate unfairly and is fair and equitable." 11 U.S.C. § 1129(b)(1). Fair and equitable treatment with respect to a class of equity interests—the sole non-accepting class in this case—means either the class receives or retains property equal to the value of its interest or no junior interest receives or retains anything under the plan. *Id.* at § 1129(b)(2)(C).

In the instant case we find that both alternatives are satisfied. No class junior to the common shareholders is receiving or retaining anything under the Plan. Further, based on our conclusion of the value of Zenith as a going concern, the shareholders are receiving the value of their interests under the Plan—nothing.

### a. *Treatment of Bondholders*

■ The Equity Committee asserts, however, that the Plan's treatment of the Bondholders violates the fair and equitable requirements of the Code. Specifically, the Plan provides that if Bondholders do not accept it, they will receive nothing under the Plan and the Plan proponents will seek cramdown pursuant to section 1129(b) as to them. In contrast, if the Bondholders accept the Plan, they will be entitled to a pro rata distribution of $50 million of the new 8.19% Senior Debentures. The Equity Committee asserts that this treatment is unfair because (1) if the Plan proponents are correct in their valuation of Zenith, Bondholders are not entitled to any distribution and offering them something for their vote in favor of the Plan is not appropriate, and (2) the shareholders were not offered a similar deal.

■ There is no prohibition in the Code against a Plan proponent offering different treatment to a class depending on whether it votes to accept or reject the Plan. *See, e.g., In re Drexel Burnham Lambert Group, Inc.,* 140 B.R. 347, 350 (S.D.N.Y.1992) (plan which provided warrants to accepting classes but not to rejecting class was not unfairly discriminatory and could be confirmed).[21] One justification for such disparate treatment is that, if the class accepts, the Plan proponent is saved the expense and uncertainty of a cramdown fight. This is in keeping with the Bankruptcy Code's overall policy of fostering consensual plans of reorganization and does not violate the fair and equitable requirement of section 1129(b).

■ Nor were the votes of the Bondholders solicited in bad faith (and subject to disqualification) as a result of the above provision. *See* 11 U.S.C. § 1126(e). The case cited by the Equity Committee to

---

**21.** *Cf. In re AOV Industries, Inc.,* 792 F.2d 1140 (D.C.Cir.1986) (court denied confirmation of plan which required creditors to release claims against plan funder in order to receive distribution). The Court in *AOV* denied confirmation because the plan provided unequal treatment to creditors *within* the same class where only one creditor in that class had a direct claim against the plan funder. Here all creditors within the Bondholder class are being treated the same.

support its position is easily distinguishable. *See In re Featherworks Corp.*, 25 B.R. 634, 641 (Bankr.E.D.N.Y.1982), *aff'd*, 36 B.R. 460 (E.D.N.Y.1984). In the *Featherworks* case, the Court disallowed the change of vote by one unsecured creditor after it had received a payment outside the Plan, from an insider of the Debtor, which resulted in it receiving a greater recovery on its claim than any other unsecured creditor. 25 B.R. at 641. In this case, the distribution in question is going to all creditors in the same class, is being made pursuant to the Plan, and is fully disclosed to all interested parties. Disqualification of the vote of that entire class is not mandated.

There is similarly no prohibition against the Bondholders receiving different (and better) treatment than the shareholders receive under the Plan. In fact, the cramdown provisions of the Code mandate that the Bondholders be treated better than the shareholders. In the absence of the Bondholders receiving payment in full or consenting, the shareholders may not receive anything under the Plan. 11 U.S.C. § 1129(b)(2)(B). Thus, it is not fundamentally unfair for the Bondholders to have been offered a distribution under the Plan in exchange for their assent to the Plan, while the shareholders were not.

### b. *Retention of stock by LGE*

The Equity Committee also asserts that the Plan violates the absolute priority rule, as recently articulated by the United States Supreme Court, by allowing LGE to obtain the stock of Zenith without subjecting it to sale on the open market. *See Bank of America v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999). The *203 North LaSalle* case, however, is distinguishable from the instant case. In that case, the plan gave the shareholders the exclusive right to "buy" the equity, without giving creditors a similar right or allowing the market to test the price. 119 S.Ct. at 1422. The Supreme Court held that because shareholders were receiving the exclusive right to bid for the equity, and creditors were not being paid in full, this violated section 1129(b)(2)(B). *Id.* at 1424.

In this case, all creditor classes have accepted the Plan and there is no objection to confirmation by any creditor. Thus, the absolute priority rule embodied in section 1129(b)(2)(B) is not even applicable. Rather, section 1129(b)(2)(C) is the applicable section in this case.

Further, in this case, it is not a shareholder who is being given the right to buy equity, it is LGE in its capacity as a substantial secured and unsecured creditor who is being given that right. In fact, if the Plan were to allow the minority shareholders the right to bid on the equity, as they urge, it would present the same problem as the *203 North LaSalle* plan did. The Supreme Court in *203 North LaSalle* did not say that a plan which allowed a senior secured creditor to buy the equity violated the Code; in fact, it suggested that the plan in that case violated the absolute priority rule because it did *not* let the creditor bid on the equity.

It is not appropriate to extend the ruling of the *203 North LaSalle* case beyond the facts of that case. To do so would require in all cases that a debtor be placed "on the market" for sale to the highest bidder. Such a requirement would eliminate the concept of exclusivity contained in section 1121(b) and the broad powers of the debtor to propose a plan in whatever format it desires. For example, section 1123(a)(5) specifically allows a debtor to propose a plan which allows the debtor to retain all or part of its property, to transfer all or part of its property, to merge or consolidate its business with others, to sell all or part of its property (subject to or free of liens), to satisfy or modify liens, and to cancel, modify or issue securities. The restriction on the debtor's right to propose a plan contained in the *203 North LaSalle* case should be limited to the facts of that case—where the absolute priority rule encompassed in section 1129(b)(2)(B) is violated.

The instant Plan does not violate the absolute priority rule articulated in section 1129(b)(2)(B) or (C) because all creditor classes have accepted the Plan and LGE is not retaining any interest because of its shareholder status. LGE is obtaining the equity in Zenith because of its status as a creditor, senior in right to the minority shareholders.

### c. *LGE's claims*

■ The Equity Committee asserts, however, that LGE's secured and unsecured claims should be disallowed, recharacterized as equity or equitably subordinated. Other than conclusory statements of the "multiplicity of relationships" between LGE and Zenith and how LGE dominated the company, there is little support offered for the Committee's premise.

■ In order for a claim to be disallowed, there must be no legitimate basis for it. The records of Zenith, its public filings, the Disclosure Statement and the testimony at the confirmation hearing all support the conclusion that LGE has claims against Zenith in excess of $375 million representing funds actually lent by it to Zenith or funds paid by it in satisfaction of its guarantee of Zenith's debts. Further, the Special Committee did review the transactions between LGE and Zenith and concluded that the restructuring provided more value to the company than the pursuit of any actions against LGE. (*See* Exh. D–1 at p. 95.) The Equity Committee presents no evidence to refute the claims of LGE. Therefore, there is no basis to disallow those claims.

■ To recharacterize debt as equity or to equitably subordinate a claim, the creditor must have done something inequitable. The Third Circuit has articulated the following test for equitable subordination:

(1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code.

*Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims,* 160 F.3d 982, 986–87 (3d Cir.1998), *citing United States v. Noland,* 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) and *In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977).

In this case, the Equity Committee has presented no evidence of inequitable conduct. There is nothing inequitable about LGE seeking to restructure its debt position in Zenith, requiring that the restructuring be accomplished in chapter 11, or insisting on 100% of the equity in exchange for forgiveness of $200 million of debt and new funding of $60 million. The valuation and other testimony at the trial confirms the fairness of the conduct of LGE. There is no basis to equitably subordinate its claims.

### 4. *Good Faith*

■ The Objectors also assert that the Plan cannot be confirmed because it violates the requirement of the Bankruptcy Code that the Plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).

■ The good faith standard requires that the plan be "proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code." *In re Sound Radio, Inc.,* 93 B.R. 849, 853 (Bankr.D.N.J.1988). *See also, Hanson v. First Bank of South Dakota, N.A.,* 828 F.2d 1310, 1315 (8th Cir.1987) (must have reasonable likelihood plan will achieve result consistent with the Code); *Connell v. Coastal Cable T.V., Inc.,* 709 F.2d 762, 764 (1st Cir.1983) (plan must bear some relationship to Code's objective of resuscitating a financially troubled company); *In re Mortgage Inv., Co.,* 111 B.R. 604, 611 (Bankr.W.D.Tex.1990) (good faith requires

a legitimate, honest purpose to reorganize and a reasonable probability of success).

We easily conclude that Zenith's Plan is proposed in good faith under the general requirements of the Bankruptcy Code. It is proposed with the legitimate purpose of restructuring its finances to permit it to reorganize successfully. The fact that Zenith is a financially troubled company cannot be disputed; its substantial losses in the last decade attest to that. Even with its operational restructuring (which significantly reduced the losses), Zenith needs more. Readjustment of its debt structure and forgiveness of a substantial amount of its debt is necessary for it to operate profitably and to position itself in the market to take advantage of the technology it owns. This reorganization is exactly what chapter 11 of the Bankruptcy Code was designed to accomplish.

### a. *Compliance with Delaware Corporate Law*

■ Both the Equity Committee and Nordhoff argue, however, that the Plan must not only comply with the provisions of the Code, but must meet the standards for approval of such a transaction under Delaware corporate law. We agree that section 1129(a)(3) does incorporate Delaware law (as well as any other applicable nonbankruptcy law).

■ In evaluating a transaction between a controlling shareholder and its corporation, the Delaware courts require a showing that the transaction is entirely fair. *See, e.g., Kahn v. Tremont Corp.*, 694 A.2d 422 (Del.1997); *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983); *NL Indus., Inc. v. MAXXAM, Inc.*, 659 A.2d 760, 771 (Del.Ch.1995) (majority shareholder is a fiduciary and has obligation to demonstrate transaction between it and corporation is entirely fair to the corporation).

■ The "entire fairness" doctrine requires a determination that both the process and the price was fair. As stated by the Delaware Supreme Court:

The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.

*Weinberger*, 457 A.2d at 711.

### i. *Fair process*

■ The initial argument of the Objectors, and notably Nordhoff, that LGE has not met the Delaware standard appears to be premised on the assertion that LGE required that Zenith file bankruptcy in order to take advantage of the Code's cramdown (and other) provisions. However, as Judge Walsh stated in *In re PPI Enterprises (U.S.), Inc.*: "As other courts have noted, it is not 'bad faith' for debtors to file for bankruptcy in order to take advantage of a particular provision of the Code." 228 B.R. 339, 345 (Bankr.D.Del. 1998) (citations omitted). Similarly, we conclude that it was not bad faith for LGE to propose a restructuring of Zenith under the auspices of the Bankruptcy Code.

The Objectors also argue that the entire process was tainted by: (1) PJSC's initial retention by LGE, (2) LGE's dominant position, (3) the lack of any effort to consider or pursue alternatives, (4) the failure of the Special Committee of the Board to obtain a fairness opinion, (5) the lack of disclosure of relevant information, and (6) the refusal to negotiate with the minority shareholders. We disagree.

As noted above, although PJSC was retained by LGE, it was only for a period of five days almost two years ago. Since that time PJSC has represented only Zenith.

It has helped Zenith with its operational restructuring and with its marketing efforts. We find no evidence that the five day retention by LGE tainted PJSC's performance for Zenith.

Similarly, we do not find that LGE's position as a significant creditor and shareholder unduly influenced the process. Throughout the negotiation of the restructuring, Zenith and LGE had separate counsel and other professionals. Zenith properly appointed a Special Committee of its Board of Directors (which did not include any LGE appointees) to negotiate with LGE. Further, LGE did not object or impede Zenith's efforts to find a different strategic investor or purchaser and, in fact, introduced Zenith to some targets. Finally, any undue influence which LGE might have had over Zenith was countered by the Bondholders participation (through separate professionals) in negotiating the Plan.

Further, we disagree with the Equity Committee's assertion that there was no effort to consider other alternatives. Mr. Gannon testified to his substantial efforts to obtain another investor or buyer. No alternative was forthcoming after eighteen months. Further, none of the Equity Committee's witnesses could identify any concrete offer or alternative to the LGE proposal that would afford creditors or shareholders a better return. The only alternative posited by them was to deny confirmation of the Plan and try to market the company while it is in bankruptcy. Mr. Gannon testified that the company could not survive that process. Given Zenith's efforts pre-bankruptcy, we conclude it would be a futile effort.

The Equity Committee asserts that it is significant that the Special Committee did not obtain an opinion attesting to the fairness of the process. We do not find this to be fatal. The Court is the ultimate arbiter of the fairness of the transaction. The lack of an expert's opinion on this point, while it may be comforting to a Board of Directors, is not dispositive of the issue.

We have already concluded that the disclosure requirements of the Code have been met by the Disclosure Statement issued by Zenith. The SEC has already determined that the Disclosure Statement meets the disclosure requirements of the Securities Acts. For the reasons stated in Part A above, we conclude that the disclosures made were consistent with fair process.

Finally, the Equity Committee argues that the failure of Zenith or LGE to have any meaningful negotiations with the minority shareholders renders the process unfair. We disagree. Since PJSC determined that there was no equity in the company, asking the minority shareholders for input into the financial restructuring of the company would have been futile. We find no evidence that the minority shareholders were denied information about the company or the process. Again, there is no suggestion that Zenith did not file the periodic reports required of a public company or that those reports were inaccurate. If the minority shareholders had a proposal for restructuring the company, they were free to present it to Zenith or LGE. There is no evidence that a proposal was ever presented to the company or ignored by it.

Consequently, we conclude that the process utilized by Zenith, LGE, and the Bondholders to negotiate a financial restructuring of the company was fair.

### ii. *Fair price*

With respect to the issue of fair price, we start with the value of Zenith which we found above, $310 million. As we stated above, our conclusion was premised on the PJSC valuation which properly considered both Zenith's current operations (the consumer electronics business and royalties earned by the tuner technology) as well as its inherent value (the future value of the VSB technology). We found the valuation of the VSB technology to be reliable and based on an evaluation of expert market reports of adoption and an assessment of

the rates which Zenith can charge in that market. Therefore, we conclude that the PJSC valuation included all aspects necessary to determine the value of Zenith and, therefore, the fairness of the price paid by LGE for it. *See, e.g., Weinberger,* 457 A.2d at 712–13 (in determining fair price, courts may use any method of valuation generally accepted by the financial community or otherwise admissible evidence of value).

Under the restructuring proposal, LGE is acquiring 100% of the equity of Zenith, which will still owe $67 million to Citibank and $50 million to the Bondholders. The net equity of the company is therefore $193 million ($310 million less the assumed debt of $117 million). In exchange, LGE is relinquishing $200 million of debt, investing up to an additional $60 million in capital funds, and exchanging $175 million in claims for the Mexican plant (valued at $40 million) plus a note for $135 million paid over time. (*See* Plan at Article III B7 (Class 6).) We conclude that LGE is paying a fair price for the equity in the new Zenith.

This is bolstered by the fact that Zenith was unable to locate any other buyer or investor in the company pre-bankruptcy despite efforts over the last two years. *See Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1286–87 (Del.1988) (board need not conduct an auction of the company but has broad discretion to negotiate sale with different bidders). Zenith's marketing strategy (CEO to CEO) fits within that broad range.

Finding that the process and the price were fair, we conclude that Zenith and LGE have met the "entirely fair" standard under Delaware law for the approval of the Plan.

b. *Releases*

The Equity Committee also objects (as patently unfair and in bad faith) the Plan provision which releases Zenith's officers and directors, LGE and its related companies, and the Bondholders' Committee and

its professionals from claims which the Debtor (or a creditor who has accepted the Plan or is in a class which has accepted the Plan or is deemed to have accepted the Plan) may have against them. (*See* Plan at Article X B & C.)

i. *Release of Debtor's claims*

 We have previously addressed this issue in the *International Wireless, Inc.,* case where we held that a Plan may, notwithstanding section 524(e), provide for releases by the debtor against third parties under certain limited circumstances. *International Wireless,* Bankr. No. 98–2007, slip op. at pp. 16—24, *citing Master Mortgage Inv. Fund, Inc.,* 168 B.R. 930 (Bankr.W.D.Mo.1994). The *Master Mortgage* Court cites five factors to consider in allowing a release of a third party as part of a plan of reorganization: (1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction. 168 B.R. at 937.

Applying the *Master Mortgage* factors to the instant case, we conclude that the releases of Zenith's claims contained in the Plan are not objectionable or in bad faith. First, the Officer and Director Releasees all share an identity of interest with Zenith. LGE, as the funder of the Plan, and the Bondholders' Committee, who were instrumental in formulating the Plan, similarly share an identity of interest with Zenith in seeing that the Plan succeed and the company reorganize.

Second, all the Releasees have made substantial contributions to the reorganization: the Officers and Directors by designing and implementing the operational restructuring and negotiating the financial restructuring with LGE; LGE by funding the Plan and agreeing to the compromise of its claim; and the Bondholders' Committee by negotiating the pre-packaged Plan and assisting in the solicitation of the Bondholders, who voted overwhelmingly in favor of the Plan.

Third, we find that the Releases are an integral part of the agreement of LGE to fund the Plan. Similarly, we find the release of the Directors and Officers as necessary to the continued success of the reorganized Zenith, because they assure that the Directors and Officers are not distracted by litigation by the estate.

Fourth, the overwhelming majority of the creditors have agreed to the releases. Over 80% of the Bondholders have voted in favor of the Plan (in excess of 98% in amount and 97% of those actually voting for the Plan accepted it). Citibank has also accepted the Plan. No impaired class of creditors has rejected the Plan.

Fifth, the Plan does provide a distribution to the creditors in exchange for the Releases. The evidence on valuation clearly establishes that the $50 million distribution under the Plan to the bondholders would not be available in a liquidation and that, absent the support of LGE or other restructuring of Zenith, it would have no choice but to liquidate.

Consequently, we believe that the Plan provision allowing the release of Zenith's claims against the Releasees may be approved.

### ii *Releases by others*

However, the Plan goes further and releases all claims against LGE of creditors who have accepted the Plan *or* who are in a class that has voted for the Plan *or* who are to receive a distribution under the Plan. (*See* Plan at Article X C.)

With respect to the latter two categories, this is not appropriate.

This is not a release of claims which Zenith (and derivatively its creditors) has against LGE, which we concluded above could be waived by Zenith (with the overwhelming support of the creditors) in exchange for LGE's funding of the Plan. This is a release of third party claims against LGE. This cannot be accomplished without the affirmative agreement of the creditor affected. *See e.g., In re Digital Impact, Inc.,* 223 B.R. 1 (Bankr. N.D.Okla.1998) (plan may not be confirmed if any party who would be bound by the release did not vote in favor of the plan); *In re West Coast Video Enters., Inc.,* 174 B.R. 906, 911 (Bankr.E.D.Pa. 1994) ("each creditor bound by the terms of the release must individually affirm same... "); *In re Elsinore Shore Assocs.,* 91 B.R. 238, 252 (Bankr.D.N.J.1988) (plan provisions deeming non-debtor proponents and their principals to be discharged and released from any and all claims prohibited by the Bankruptcy Code and relevant case law); *In re Monroe Well Serv., Inc.,* 80 B.R. 324, 334 (Bankr.E.D.Pa.1987) (debtors could not obtain confirmation of a plan which would attempt, over their objection, to discharge the obligations of non-debtors).

Therefore, we conclude that this provision must be modified to permit the release only of Zenith's claims against LGE and the claims of any creditor who actually voted in favor of the Plan.

### III. *CONCLUSION*

For all the foregoing reasons, we conclude that the objections of the Equity Committee and Nordhoff to approval of the Disclosure Statement should be overruled. We further conclude that the Plan satisfies the requirements of sections 1123 and 1129 of the Bankruptcy Code and may be confirmed if modified in accordance with the comments in Part B4 above. An appropriate Order is attached.

## ORDER

**AND NOW,** this **2d** day of **NOVEM-BER,** for the reasons set forth in the accompanying Opinion, it is hereby

**ORDERED** that our Order of August 24, 1999, authorizing Zenith to retain Peter J. Solomon Company Limited is hereby **VACATED;** and it is further

**ORDERED** that the Disclosure Statement and Proxy Statement–Prospectus filed by Zenith Electronics Corporation on August 24, 1999, is **APPROVED** as containing sufficient information pursuant to 11 U.S.C. §§ 1126(b) & 1125(a); and it is further

**ORDERED** that the Prepackaged Plan of Reorganization of Zenith Electronics Corporation under Chapter 11 of the Bankruptcy Code filed on August 24, 1999, will be **CONFIRMED** pursuant to 11 U.S.C. § 1129, if modified within 10 days to delete any release by any claimant which has not affirmatively accepted the Plan.