In re ZENITH ELECTRONICS
CORPORATION, Debtor.

Nordhoff Investments, Inc., Appellant,

v.

Zenith Electronics Corporation, Cross–
Appellant and Appellee.

The Official Committee of Equity
Holders, Appellant,

v.

Zenith Electronics Corporation, Cross–
Appellant and Appellee.

Nos. 99–2911 (MFW), 98–84 GMS, 99–85
GMS, CIVA99–921 GMS, CIVA 00–
32 GMS, CIVA 00–31 GMS.

United States District Court,
D. Delaware.

June 20, 2000.

Jeffrey M. Schlerf, Elio Battista, Jr., The Bayard Firm, Wilmington, Delaware, Arnold S. Albert, Albert & Schulwolf, LLC, Washington, D.C., for Nordhoff Investments Inc.

Norman L. Pernick, Saul, Ewing, Remick & Saul LLP, Wilmington, Delaware, for The Official Committee of Equity Holders.

Laura Davis Jones, Pachulski, Stang, Ziehl, Young, & Jones, P.C., Wilmington, Delaware, James H.M. Sprayregen, David J. Zott, Ilana S. Rubel, Kirkland & Ellis, Chicago, Illinois, for Zenith Electronics Corp.

## MEMORANDUM OPINION

SLEET, District Judge.

## I. INTRODUCTION

In these consolidated appeals, Appellants Nordhoff Investments, Inc. ("Nordhoff") and the Official Committee of Equity Holders ("the Equity Committee," together with Nordhoff, "Appellants") appeal from two orders of the United States Bankruptcy Court for the District of Delaware confirming the Prepackaged

Plan of Reorganization ("the Plan") submitted by Zenith Electronics Corporation ("Zenith"), the debtor in this case brought under Chapter 11 of the Bankruptcy Code. In an opinion and accompanying order dated November 2, 1999, the Bankruptcy Court rejected various objections to the Plan. However, the Court conditioned its confirmation of the Plan on Zenith's submission of a modification to a Plan provision addressing releases of claims against certain non-debtors. Zenith submitted the required modification on November 4, 1999. The Bankruptcy Court then confirmed the Plan, as modified, by its order dated November 5, 1999. Nordhoff and the Equity Committee have each appealed from the November 2nd and 5th orders.[1]

Before the court is Zenith's motion to dismiss the appeals under the doctrine of "equitable mootness." For the reasons that follow, the court will grant Zenith's motion and dismiss these appeals.

## II. BACKGROUND AND PROCEDURAL POSTURE

### A. *Events Leading up to Zenith's Bankruptcy Filing*

Prior to filing for bankruptcy in August of 1999, Zenith had been experiencing severe financial difficulties for some time. In 1995, a Zenith shareholder, LG Electronics, Inc. ("LGE") invested over $360 million in the company. That investment increased LGE's holdings from approximately 5% to approximately 58% of Zenith's stock. Over the next few years LGE also made substantial loans to Zenith. By 1997, LGE officers held 6 of the 11 seats on the Zenith board of directors.

After Zenith continued to sustain losses, LGE and Zenith began to explore operational changes and/or financial restructuring. In April of 1998, LGE proposed a major restructuring of Zenith's debt and equity. Zenith appointed a Special Committee of its board of directors to evaluate the proposal and negotiate with LGE on Zenith's behalf. After LGE and the Special Committee reached agreement, negotiations began with a committee of Zenith's bondholders ("the Bondholders' Committee"). The restructuring proposal was ultimately reduced to a prepackaged plan of reorganization ("the Plan").

Major features of the Plan included: (1) the exchange of approximately $103 million of bonds bearing interest at 6.25% for $50 million of bonds bearing interest at 8.19%; (2) the cancellation of all of Zenith's stock, for no consideration; (3) the issuance of new Zenith stock to LGE, in exchange for the cancellation of approximately $200 million of debt owed by Zenith to LGE; (4) LGE's extension of a new $60 million credit facility to Zenith; (5) the cancellation of approximately $175 million of additional debt owed to LGE in exchange for $135 million of new debt and the transfer of Zenith's television assembly plant in Reynosa, Mexico; (6) refinancing of certain debt owed to a consortium of banks led by Citicorp[2]; and (7) no alteration of debt owed to trade creditors. In addition, the Plan included provisions releasing LGE, the Zenith directors and officers, and the Bondholders' Committee from claims or suits that could otherwise have been brought by Zenith or by certain creditors.

### B. *Proceedings in the Bankruptcy Court*

After issuing a disclosure statement and securing the necessary votes from those

---

**1.** The Equity Committee was appointed to represent the interests of all of Zenith's minority shareholders. Nordhoff was a significant minority shareholder, owning approximately 1 million shares.

**2.** The parties' briefs and the Bankruptcy Court's opinion have referred to "Citicorp,"

"Citibank," and "Citigroup." It is the court's understanding that all such references were intended to identify the same lender (or a successor entity). To avoid confusion, the court will refer to this lender as Citicorp throughout this opinion.

classes entitled to vote (LGE, the bondholders, and Citicorp), Zenith submitted the Plan to the Bankruptcy Court on August 24, 1999. The Bankruptcy Court approved Zenith's request for an expedited confirmation hearing. The hearing was held on September 27–28, 1999.

On November 2, 1999 the Bankruptcy Court issued an opinion conditionally confirming the Plan. *See In re Zenith Electronics Corp.*, 241 B.R. 92 (Bankr.D.Del. 1999). The Court rejected various objections asserted by Nordhoff and the Equity Committee, but did take issue with one of the Plan's release provisions mentioned above. The Court permitted the release of all claims by Zenith, but concluded that the Plan could not release claims by any creditor who did not vote in favor of the Plan. In an order accompanying its opinion, the Court indicated that the Plan "will be confirmed ... if modified within 10 days to delete any release by any claimant which has not affirmatively accepted the Plan." *Id.* at 112.

Nordhoff and the Equity Committee both received a copy of the Bankruptcy Court's opinion and order on November 3rd. On November 4th, Zenith submitted a Plan Amendment modifying the release provision in accordance with the Court's opinion. It also submitted a proposed order confirming the Plan. Zenith served a copy of these submissions on counsel for the Equity Committee, but did not serve a copy on counsel for Nordhoff. The Court signed the confirmation order on Friday, November 5, 1999, but apparently did not contact the parties at that time.

On Tuesday, November 9th, Zenith faxed a letter to counsel for Nordhoff and counsel for the Equity Committee. The letter was accompanied by a copy of Zenith's November 4th submission to the Bankruptcy Court. In the letter, counsel for Zenith states: "We understand that the Court signed the Confirmation Order on November 5, 1999, and that the Order was entered on the docket that day." Although the letter refers to and encloses a printout from the Court's web site, the letter does not make clear how or when Zenith learned that the confirmation order had been signed and entered. Though not entirely clear from the briefs, it appears that Zenith was aware on November 5th that the Plan had been confirmed. *See* Reply Br. at 7.

On November 10, 1999, Zenith received a signed copy of the Bankruptcy Court's November 5th confirmation order. It faxed copies to Nordhoff and the Equity Committee that same day. On November 12th, Nordhoff and the Equity Committee filed notices of appeal in the Bankruptcy Court.

### C. *Implementation of the Plan*

By the time Zenith received the signed confirmation order on November 10th, much of the Plan had already been implemented. On November 9th, the same day that Zenith first informed Nordhoff of its November 4th submission to the Court, Zenith *completed* the following transactions pursuant to the Plan: (1) it replaced its Debtor–in–Possession credit facility with a new $150 million credit facility syndicated by Citicorp; (2) it entered into a new $60 million credit facility with LGE; (3) it canceled all old stock and issued new stock to LGE; and (4) it canceled certain debt to LGE, issued new debt to LGE, and canceled some of the new debt "in exchange for the transfer of Reynosa [Zenith's television assembly plant in Mexico] at a later date." Aff. of Michael Samuels, Zenith's Treasurer, at ¶ 3.[3]

As to the bonds that were to be exchanged under the Plan, Zenith sent a letter to bondholders "shortly after" confirmation of the Plan. *Id.* at ¶ 6. It is not clear whether this letter went out before or after November 9th. Bondholders began tendering their bonds on November 19, 1999. By January 1, 2000, approxi-

3. The transfer of the plant "became final" on January 1, 2000. *Id.* at ¶ 12.

mately 99% of the new bonds had been issued. *Id.* at ¶¶ 6–8.

### D. *Briefing Schedule on Appeal*

On December 23, 1999, Nordhoff filed a motion to consolidate its appeal with that of the Equity Committee, and a motion to expedite the appeals.[4] Zenith opposed the motion to expedite. On January 19, 2000, Zenith filed a motion to dismiss the appeals on equitable mootness grounds, and also filed an emergency motion to stay briefing on the merits of the appeal pending resolution of its motion to dismiss.

On January 24, 2000, the court held a teleconference to address each of these motions. The motion to consolidate appeals was granted as unopposed. With respect to the briefing schedule, Zenith contended that the equitable mootness issue should be briefed first because it would likely dispose of the appeals and save all parties the time and expense of briefing the merits of the appeal. Nordhoff disagreed, for two reasons. First, it expressed concern that Zenith's equitable mootness argument would only become stronger as time passed. Second, it asserted that the court needs to understand the whole context of the appeal, including the nature of the issues being appealed, in order to properly consider the equitable mootness defense.

In response to the first concern, Zenith expressly represented to the court that it would rely only on events that had already occurred in support of its mootness defense. *See* 1/24/00 Tr. at 27. Based on that representation, Nordhoff proposed a resolution to the briefing dispute. Nordhoff would accede to the stay of briefing requested by Zenith, provided that it be permitted to file its opening brief on the merits of its appeal as an appendix to its brief in opposition to Zenith's motion to dismiss. Zenith would then file a reply brief, but would not be required to file its answering brief on the merits of the appeal until after the court ruled on the motion to dismiss. Zenith accepted this proposal, as did the court.

### E. *The Issues Raised in the Appeals*

Nordhoff raises nine issues in its appeal.[5] Seven of these issues are related to the Bankruptcy Court's determination that Zenith's minority shareholders received the fair value of their shares—nothing. That determination turned on the valuation of Zenith as a going concern. The Court relied heavily on the testimony and

---

4. The actual notices of appeal were not docketed in the district court until January 19, 2000, under civil action #'s 00–31 (Equity Committee) and 00–32 (Nordhoff).

5. The Equity Committee has thus far taken a passive role in these appeals. Nordhoff is separately represented and filed its briefs on its own behalf. The Equity Committee has filed notices indicating that it joins in Nordhoff's submissions. *See* D.I. 26 and 27. Nordhoff's opening brief raises the following issues:

 1. Whether the Bankruptcy Court erred by its failure to disqualify Zenith's expert witness on the grounds that he had a non-waivable conflict of interest.
 2. Whether the Court erred by its failure to disqualify Zenith's expert witness on the grounds that he had an outcome determinative fee.
 3. Whether the Court erred in its determination that Zenith's expert witness testi-

mony was not "tainted" by the conflict and the outcome determinative fee.
 4. Whether the Court erred in granting the Debtor's request for an expedited hearing.
 5. Whether the Court erred in its application of the United States Supreme Court's ruling in *Bank of America v. 203 N. LaSalle Street Partnership*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999).
 6. Whether the Court erred in its finding that the value of Zenith was $310 Million.
 7. Whether the Court erred in its finding that the Plan was fair and equitable to equity holders.
 8. Whether the Court erred in its finding that the Plan was proposed in good faith and not in violation of law.
 9. Whether the Court erred in approving releases for LGE and Zenith's board and officers.
*See* Nordhoff's Opening Br. (filed as an appendix to its Opp'n Br. to Zenith's Mot. to Dismiss) at 1–2.

report provided by Zenith's expert witness on valuation—the Peter J. Solomon, Co. ("PJSC"). PJSC concluded that Zenith's value was $310 million. The Equity Committee's expert witness, Ernst & Young, valued Zenith at $1.05 billion. The primary difference of opinion related to the value of Zenith's patented "VSB" technology. The FCC has apparently concluded that this technology, which is used in the transmission of digital television signals over airwaves, will be the standard to be used by the digital television industry in the United States. *See Zenith,* 241 B.R. at 103–104.

The Bankruptcy Court accepted PJSC's valuation. The Court did, however, conclude that it should not have authorized Zenith to retain PJSC because of a conflict of interest that arose from work PJSC had done for LGE in late 1997. Though the Court found that this conflict of interest barred Zenith's retention of PJSC under 11 U.S.C. § 327(a),[6] it concluded that the conflict did not "taint" PJSC's testimony as an expert witness in this case. *See Zenith,* 241 B.R. at 100–102. Based on PJSC's $310 million valuation of Zenith as a going concern, the Court concluded that Zenith's equity interests had no value. That, in turn, led to the Court's conclusion that the Plan was proposed in good faith and in compliance with fiduciary duties owed to Zenith's minority shareholders under Delaware corporate law. *See id.* at 107–110.

As previously noted, seven of the nine issues on appeal relate to the Bankruptcy Court's determination of Zenith's value. The other two decisions Nordhoff challenges are: (1) the granting of Zenith's request for an expedited confirmation hearing; and (2) the approval of Plan provisions releasing LGE and Zenith's directors and officers from certain claims or potential lawsuits.

**6.** At the outset of the bankruptcy proceedings, the Court had approved Zenith's motion to retain PJSC. At that time, the Court was apparently unaware of the facts that ultimately

## III. DISCUSSION

### A. *The Doctrine of Equitable Mootness*

The Third Circuit Court of Appeals adopted the doctrine of equitable mootness in *In re Continental Airlines,* 91 F.3d 553 (3d Cir.1996) (*in banc*). That case involved an appeal of the confirmation of a complicated Chapter 11 reorganization of a major airline. The success of the plan turned on the willingness of two outside investors ("the Investors") to invest $450 million dollars into the reorganized debtor. *See id.* at 556, 563–564. The appellants were trustees of certain creditors whose claims were secured by 29 aircraft and 81 jet engines.

The trustees had sought payment for an administrative claim of approximately $117 million against the reorganized debtor. The claim related to the alleged post-petition decline in market value of the collateral. The Investors had conditioned their investment on the amount of allowed administrative claims that the reorganized debtor would be required to assume. Had the trustees' claim been allowed, the "cap" imposed by the Investors would have been exceeded. This would have given the Investors the right to walk away from the deal. *See id.* at 563. The bankruptcy court rejected the trustees' claim, and, at the urging of the debtor, incorporated its rejection of the claim into its order confirming the plan of reorganization. *See id.* Following confirmation, the trustees sought a partial stay pending appeal. That request was denied when the trustees refused to post a bond. *See id.* at 557, 562. In reliance on the unstayed confirmation order, the Investors made their investment and the plan of reorganization was implemented. Soon thereafter, the debtor moved to dismiss the trustees' appeals under the doctrine of equitable mootness. *See id.* at 557–558. The district court

led the Court to conclude that retention was impermissible. In its November 2nd opinion and order, the Court vacated its prior order authorizing the retention of PJSC.

granted the motion and dismissed the trustees' appeal without reaching the merits of the issues raised on appeal.

■ The Third Circuit affirmed, in a sharply divided 7–6 *en banc* opinion. As a matter of first impression in this circuit, the court adopted the doctrine of equitable mootness. The court surveyed case law from other circuits. As a result, the court described the doctrine as follows: "Under this widely recognized and accepted doctrine, the courts have held that '[a]n appeal should ... be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.'" *Id.* at 558–559 (quoting *In re Chateaugay Corp.*, 988 F.2d 322, 325 (2d Cir.1993)); *see also In re Continental Airlines*, 203 F.3d 203, 209 (3d Cir.2000) ("Under the doctrine of equitable mootness, an appeal should be dismissed, even if the court has jurisdiction and could fashion relief, if the implementation of that relief would be inequitable.").

■ This doctrine is distinct from mootness in the Constitutional sense. *See Continental,* 91 F.3d at 558. Indeed, the court noted that the term "equitable mootness" is "an inapt description of the doctrine." *See id.* at 559. The equitable mootness determination involves a "discretionary balancing of equitable and prudential factors." *Id.* at 560. "If limited in scope and cautiously applied, this doctrine provides a vehicle whereby the court can prevent substantial harm to numerous parties." *Id.* at 559.

■ In *Continental*, the court recognized five factors that other courts had considered in determining whether it would be equitable or prudential to reach the merits of a bankruptcy appeal: "(1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments." *Id.* at 560 (citations omitted). Applying these factors, the *Continental* court concluded that the district court had not abused its discretion by dismissing the appeal before it on equitable mootness grounds. *See id.* at 566–567.

B. *Application of the Doctrine to the Instant Appeals*

 1. *Substantial Consummation of the Plan*

■ It is beyond question that the Plan has been substantially consummated. "Substantial Consummation" is defined in the Bankruptcy Code as: "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor of the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." 11 U.S.C. § 1101(2).[7] As noted above, many of the key transactions contemplated by the Plan were completed on November 9, 1999. Indeed, the Bankruptcy Court's confirmation order states that the Plan would be deemed to be substantially consummated on its effective date. *See* 11/5/99 Conf. Order at 26. By January 1, 2000, all that was left to accomplish was the exchange of the last 1% of the bonds to be issued under the Plan.

This factor, therefore, weighs in favor of dismissing the appeals. In *Continental*, the court noted that this factor is typically the

---

**7.** Equitable mootness is a judicially created doctrine; it is not statutory. The definition of "substantial consummation" provided in § 1101 is applicable to the determination of whether a plan proponent or reorganized debtor may seek to modify a confirmed plan of reorganization. *See* 11 U.S.C. § 1127(b). It appears, however, that this same definition has been incorporated into the equitable mootness inquiry. *See Continental,* 91 F.3d at 561.

"foremost consideration" in an equitable mootness analysis. *Id.* at 560. This is particularly true when the Plan "involves intricate transactions ... or where outside investors have relied on the confirmation of the plan." *Id.* at 560–561 (citations omitted). Nordhoff contends that neither of these circumstances is present here. It asserts that the Plan transactions were very simple, and that, in essence, the Plan merely obtained Bankruptcy Court approval for two agreements that could have been accomplished outside of bankruptcy—(1) a negotiated reduction in bond debt; and (2) LGE's "purchase" of the minority shares for zero consideration. Further, Nordhoff contends that there are no "outside investors" that have changed their position in reliance on confirmation of the Plan.

Although Nordhoff's characterization of the transaction is somewhat of an oversimplification, its point is not completely without merit. In *Continental,* the court noted that "numerous irrevocable transactions [had] been completed as a result of the consummation of the Plan." *Id.* at 566–567. Those transactions included the merging of 53 other debtors with and into Continental, the investment of $110 million in cash by two outside investors,[8] and the transfer by foreign governments of various route authorities. *See id.* at 567. By contrast, Zenith is still Zenith. It did not merge with any other entity. Though an assembly plant was transferred to LGE— formerly Zenith's majority shareholder and now its only shareholder—there does not appear to be any reason why, if need be, ownership of the plant could not be transferred back to Zenith. Similarly, LGE's exchange of debt for stock could be reversed if necessary. And it appears that Citicorp was a major creditor before, during, and after the bankruptcy proceedings. Thus, "reversal" of the Citicorp refinancing appears to be feasible. The exchange of the bonds, however, would seem to pres-

ent a more difficult problem. The bonds are publicly traded. Many of these bonds may have already been sold, perhaps more than once since consummation. It would likely be difficult to "reverse" the bond exchange, and such "reversal" would almost certainly impact the rights of investors that were not involved in the bankruptcy proceedings. Still, reversal of these transactions would not likely be quite as daunting a task as the "unmerging" of 54 debtors and the return of the outside investors' investments in *Continental.*

In sum, there is no question that the Plan has been substantially consummated. Although some of the Plan transactions could conceivably be "reversed," this would not be easy to accomplish, and other transactions may not be reversible at all. This factor, therefore, weighs heavily in favor of dismissal, at least to the extent that the court could not fashion relief that would not result in the dismantling of the Plan.

### 2. *The Failure to Obtain a Stay*

■ Neither of the Appellants ever requested a stay of the confirmation order pending appeal. The failure to seek or obtain a stay is ordinarily a factor that weighs in favor of dismissal for equitable mootness. *See Continental,* 91 F.3d at 561–562 (noting that parties may seek to preserve the status quo by obtaining a stay under Bankruptcy Rule 8005, and that "the party who appeals without seeking to avail himself of that protection does so at his own risk.") (quoting *In re Chateaugay Corp.,* 988 F.2d 322, 326 (2d Cir.1993)).

To the extent that this is viewed as a "prudential" factor, it would seem to be largely duplicative of the "substantial consummation" factor already discussed. That is, it would seem that a Plan would typically be "substantially consummated" only if the appellant had failed to obtain a

8. The outside investors' total investment was $450 million. It is not clear whether the remainder of the investment was in some form other than cash, or whether the rest of the investment had simply not yet been made.

stay. Further, as a "prudential" factor, it is difficult to distinguish between a stay not sought and a stay sought but not obtained. *See Continental*, 91 F.3d at 562 (noting that *seeking* a stay may not be enough to prevent an appeal from becoming equitably moot because " 'a stay not sought, and a stay sought and denied, lead equally to the implementation of the plan' ") (quoting *In re UNR Indus.*, 20 F.3d 766, 770 (7th Cir.1994)).

■ As an "equitable" factor, however, the failure to even seek a stay would seem to have significance beyond the mere failure to obtain a stay. In the instant case, however, it is not entirely clear which way the "equities" cut with respect to the fact that the confirmation order has not been stayed. Zenith did not provide Nordhoff a copy of its November 4th submission to the Bankruptcy Court until November 9th. As discussed more fully above, the November 4th submission was a prerequisite to the Bankruptcy Court's confirmation of the Plan. In its briefs, Zenith noted that it did serve the Equity Committee with a copy of its November 4th submission, and that Nordhoff was a member of the Equity Committee. Still, Zenith did not explain why, despite the fact that Nordhoff and the Equity Committee were separately represented and were acting independently in the bankruptcy proceedings, it did not serve a copy on Nordhoff as well. It was not until oral arguments were held that Zenith indicated that the failure to serve Nordhoff appeared to have been an oversight.

Moreover, it appears that Zenith learned on November 5th that the Plan had been confirmed, but waited until November 9th to notify Nordhoff and the Equity Committee. By that time, the Plan may have already been substantially consummated. It is unclear whether Zenith had a legal duty to notify the Appellants that the Plan had been confirmed.[9] Even if no such duty would ordinarily arise, Zenith's failure to serve its November 4th submission on Nordhoff may have made it inequitable not to inform Nordhoff sooner that the Plan had been confirmed. Indeed, the fact that Zenith did give such notice on November 9th suggests that it recognized some responsibility for keeping Nordhoff and the Equity Committee informed. That Zenith waited until November 9th, by which time it may have been more difficult to obtain a stay, is suspicious. Certainly, Zenith must have known that the minority shareholders, whose shares were extinguished without consideration, would want to appeal the confirmation order.

Nevertheless, it is undisputed that neither Nordhoff nor the Equity Committee made any efforts to obtain a stay of the confirmation order. Although the events that followed the issuance of the Bankruptcy Court's November 2nd opinion occurred quite rapidly, this should have come as no surprise to anyone involved in the proceedings before the Bankruptcy Court.[10] As such, upon receipt of the Court's November 2nd opinion and order, both Nordhoff and the Equity Committee should have realized that Plan confirmation was imminent and that the Plan would be implemented as soon as possible after confirmation.[11] Even before the final confirmation

9. Nordhoff and the other investors represented by the Equity Committee were minority shareholders of Zenith. This raises a question as to whether Zenith and/or LGE owed a fiduciary duty to afford them some reasonable opportunity to appeal (or at least stay) the confirmation order. It may be, however, that any such fiduciary relationship ceased to exist with the November 5th signing of the confirmation order, if not before that time.

10. Indeed, at oral arguments on the instant motion, counsel for Nordhoff commented that

the Bankruptcy Court proceedings were the most rushed proceedings he had ever seen.

11. It could not be seriously doubted that Zenith would make the Plan modifications required by the Bankruptcy Court's November 2nd opinion and order. Nordhoff itself describes such modifications as "minor changes" to the Plan. *See* Nordhoff's Opening Br. (filed as an appendix to its Opp'n Br. to Zenith's Mot. to Dismiss) at 6.

order was issued, Nordhoff could have taken steps to ensure that it would have some opportunity to request a stay of the final order.[12]

Further, although Zenith failed to serve Nordhoff with its November 4th submission to the Bankruptcy Court, that does not excuse the Equity Committee's failure to take some action upon receipt of that submission.[13] And, as pointed out by Zenith at oral arguments, Nordhoff has not stated that it did not *actually receive* a copy of Zenith's submission on November 4th—only that *Zenith did not provide it* with a copy until November 9th. While the record is unclear, it may be that the Equity Committee forwarded a copy to Nordhoff prior to the 9th. As previously noted, Nordhoff was a member of the Equity Committee.

Lastly, the Appellants have failed to adequately explain why they made no effort to obtain a stay on or after November 9th, the date on which Zenith informed them that the Bankruptcy Court had issued an order confirming the Plan. Although substantial implementation steps had already been taken by that time, it appears that a stay could have at least prevented the bonds from being exchanged. As noted above, the exchange of those bonds appears to be one of the more difficult of the implementation transactions to reverse at this point.

Therefore, while the circumstances surrounding the Appellants' failure to obtain or even seek a stay suggest that this factor should receive somewhat less weight than it ordinarily would, it does still weigh in favor of a finding of equitable mootness.[14]

### 3. The Effect of the Requested Relief on Third Parties Not Before the Court

In *Continental,* the reliance interests of the two outside investors weighed heavily in the court's equitable mootness analysis. *See Continental,* 91 F.3d at 562–565. The court began its analysis of this factor by stating: "High on the list of prudential considerations taken into account by courts considering whether to allow an appeal following a consummated reorganization is the reliance by third parties, in particular investors, on the finality of the transaction." *Id.* at 562 (citations omitted). It then cited a Fifth Circuit case for the proposition that "the concept of 'mootness' from a prudential standpoint protects the interests of non-adverse third parties who are not before the reviewing court but who have acted in reliance on the plan as implemented." *Id.* (quoting *In re Manges,* 29 F.3d 1034, 1039 (5th Cir.1994)). The court accepted the district court's findings that

---

**12.** Nordhoff notes that the November 2nd order was not yet final and appealable as to Plan confirmation since the Court merely expressed a willingness to confirm the Plan if modified in accordance with the Court's opinion. While that may be true, Nordhoff could have informed the Bankruptcy Court that it intended to appeal the final confirmation order when issued, and could have asked the Court to order that the Plan not be implemented until after Nordhoff could be afforded an opportunity to be heard on a request for a stay pending appeal.

**13.** As previously noted, the Equity Committee has taken a passive role in these appeals. However, the Equity Committee was an active participant in the proceedings before the Bankruptcy Court. Had that not been the case, Zenith's service of its November 4th submission on the Equity Committee but not

on Nordhoff might have been more suspicious.

**14.** Despite the fact that Zenith expressly represented to the court on January 24th that it would not rely on any future events in support of its mootness defense, it stressed in its reply brief, filed February 11th, that: "**To this day, Nordhoff has never sought a stay.**" Reply Br. at 6 (emphasis in original). Zenith's emphasis on Nordhoff's "continuing" failure to seek a stay not only conflicts with its representation to the court, it is also not persuasive. By mid-January of 2000 (and perhaps even earlier), there were no remaining Plan implementation steps to be stayed. But as discussed above, the failure of both appellants to take any steps to have the confirmation order stayed pending appeal does weigh in favor of dismissing these appeals.

the outside investors relied on the unstayed confirmation order in making their $450 million investment, and that the relief requested by the appellants would undermine the grounds upon which the investors relied. *See id.* at 564. "By the time the district court ruled on the appeal, it was no longer possible to restore the parties to their earlier positions because the investment had been made, and the option to withdraw was no longer available to the Investors." *Id.*

In light of the "central importance" that the Third Circuit placed on the reliance of the Investors, *see id.* at 565, Zenith points to six categories of "third parties" whose reliance interests would be undermined by reversal of the confirmation order: (1) the consortium of lenders headed by Citicorp; (2) Zenith's bondholders; (3) Zenith's retailers and distributors; (4) Zenith's vendors, suppliers and other service providers; (5) LGE; and (6) Zenith's former minority shareholders.

Although each of these groups may have relied to some extent on confirmation of the Plan, none appear to merit the same "outside investor" status as the Investors in *Continental.* Zenith notes that the Citicorp lenders have advanced approximately $40 million on a $150 million credit facility entered into in reliance on Plan confirmation. But Nordhoff contends that the Citicorp consortium cannot be considered a "third party" because it has been a secured lender before, during, and after the bankruptcy proceedings.[15] Further, Nordhoff notes that as a secured lender, Citicorp would not suffer an adverse impact as a result of appellate review. Finally, these lenders voted in favor of the Plan and were represented by counsel in the bankruptcy proceedings. As such, it is at least questionable that they should be viewed as "third parties not before the court."

The reliance interests of the bondholders are, perhaps, more strongly implicated

than the interests of the Citicorp lenders. Like the Citicorp lenders, the bondholders were not "outside" investors in the sense that the Investors were in *Continental.* That is, they never had the option of simply "walking away from the deal," so they did not lose any such opportunity by acting in reliance on confirmation of the Plan. However, because the bonds are publicly traded, the bondholders today may not be the same investors as the bondholders at the time of Zenith's bankruptcy filing or the Plan's confirmation. Many sales of these bonds may have occurred in reliance on the creditworthiness of the reorganized debtor. Whether these reliance interests will be impaired depends upon the impact of appellate review on that creditworthiness. It would seem that the bondholders would likely be harmed only if reversal of the confirmation order leads to the withdrawal of LGE's support for the reorganization.

As to Zenith's retailers, distributors, suppliers, etc., Zenith's evidence of reliance is somewhat thin. Such evidence consists of an affidavit submitted by Michael Samuels, Zenith's Treasurer. Samuels states that Zenith's retailers and distributors entered into purchase commitments with Zenith in reliance on the finality of Zenith's reorganization. He further notes that these third parties have allocated shelf space and other resources based on the continued quality and availability of Zenith's products. Similarly, Samuels states that vendors and other suppliers have allocated production capacity in reliance on the reorganization, and have extended credit to Zenith on terms that they may not otherwise have been willing to offer. At least some of these unnamed entities are likely to be "third parties" entitled to consideration under the equitable mootness analysis. The potential harm to

---

**15.** It is not clear whether the "consortium of lenders led by Citicorp" to which Zenith refers is comprised of exactly the same lenders that were Zenith creditors on the date it filed for bankruptcy. Zenith does not, however, appear to assert otherwise.

these parties, however, is somewhat speculative.

Zenith's efforts to characterize LGE as a "third party" are unpersuasive. LGE was Zenith's majority shareholder prior to bankruptcy and, as a result of the Plan, it is now Zenith's only shareholder. LGE cannot be considered an "outside" investor comparable to the Investors in *Continental.* Although LGE could have "walked away from the deal," it could not have done so without incurring huge losses by virtue of its preexisting equity and debt investments in Zenith. Further, if the Appellants are correct in their assertion that Zenith was worth far more than $310 million, LGE is the primary beneficiary of the Bankruptcy Court's error.

Finally, Zenith claims that its former minority shareholders may have taken tax deductions or done their tax planning in reliance on the worthlessness of their stock. However, Zenith has provided no affidavits or other evidence to support its suggestion that its former shareholders might prefer to retain their tax deductions rather than their Zenith stock. As the Equity Committee, which represents the interests of Zenith's former shareholders, is not troubled by this potential loss of tax deductions, neither is the court.

In sum, there are third parties who have likely relied on confirmation of the Plan and who could be harmed by reversal of the confirmation order. Although these third parties may not be properly characterized as "outside investors," such investors are not the *only* types of third parties given consideration in an equitable mootness analysis. *See Continental,* 91 F.3d at 562 ("High on the list of prudential considerations ... is the reliance by third par-

ties, *in particular* investors, on the finality of the transaction." (emphasis added)). Therefore, while this factor may not warrant quite as much weight as it did in *Continental,* it does still weigh in favor of a finding of equitable mootness.

### 4. Whether the Relief Requested Would Affect the Success of the Plan

The Appellants challenge a fundamental underpinning of the Plan—i.e., the value of Zenith as a going concern. At least two fundamental aspects of the Plan turned on that value—(1) LGE's emergence as Zenith's sole shareholder with no consideration being paid to the minority shareholders; and (2) the bondholders' acceptance of new bonds with a total of $50 million in face value in exchange for their old bonds with a total of $103 million in face value. If the Appellants succeed in their challenge to Zenith's value, the Plan would necessarily be undermined. Indeed, that is the intended result of these appeals. That is, the Appellants have no interest in seeing the Plan succeed. In the hopes that a new plan will be developed, they seek to have the Plan rejected.[16]

Unfortunately, no new plan has been offered. The Appellants simply suggest that if the Bankruptcy Court were to find that the going concern value of Zenith exceeds $310 million, LGE (or perhaps some other potential purchaser) should be willing to pay any additional value so found. But even if the Bankruptcy Court found on remand that the value was higher than $310 million, there is certainly no guarantee that LGE would agree with the Court's conclusion and agree to purchase Zenith for that higher amount.[17] Nor have

---

**16.** The Appellants appear to suggest that the court could fashion some form of relief that would leave the Plan intact. *See* Opp'n Br. at 22–23. While the contours of such alternative relief are anything but clear, it appears that any such relief would, in essence, impose upon the parties a substantially different plan of reorganization than that which was negotiated, voted upon, and confirmed by the Bank-

ruptcy Court. *See Continental,* 91 F.3d at 564–565 (citing *In re Specialty Equipment Companies,* 3 F.3d 1043, 1049 (7th Cir.1993)).

**17.** At oral arguments, Zenith noted that its going concern value would have to exceed $700 million before its equity holders would be entitled to share in any such value. Nordhoff did not suggest a different figure, but

the Appellants identified any other potential purchaser of Zenith.

Zenith contends that reversal of the confirmation order "would not only cause the complete collapse of Zenith's Plan; it would probably mean the end of Zenith." Opening Br. at 18. In support of this assertion, Zenith has provided the affidavit of Michael J. Samuels, Zenith's Treasurer. Samuels states that Zenith's business operations would be severely impaired if the Plan were reversed, and that reversal would "in all probability" force Zenith to liquidate under Chapter 7 of the Bankruptcy Code. *See* Samuels Aff. ¶¶ 15–21, 27. These predictions appear to assume that LGE would not provide further financial support to Zenith in order to protect its investment.

Appellants suggest that LGE has supported Zenith in the face of past losses, and will continue to do so in the future. Although Zenith has not provided evidence that LGE will abandon Zenith if the confirmation order is reversed, the Appellants' confidence that LGE will continue to fund Zenith's operating losses is equally unsupported. As such, reversal of the confirmation order would, at the very least, appear to place Zenith's future in serious doubt.

### 5. *The Public Policy of Affording Finality to Bankruptcy Judgments*

Though identified as a separate "factor" to consider, the public policy of affording finality to bankruptcy judgments is probably better described as the lens through which the other equitable mootness factors should be viewed. In *Continental,* for example, the court discussed this public policy in the context of explaining the proper inquiry under the third factor—third party reliance on the Plan. After accepting the district court's finding that outside investors had committed to

investing $450 million in the reorganized debtor in reliance on the unstayed confirmation order, the court rejected the proposition that the court should focus on whether such reliance was "reasonable." The court explained:

> Our inquiry should not be about the "reasonableness" of the Investors' reliance or the probability of either party succeeding on appeal. Rather, we should ask whether we want to encourage or discourage reliance by investors and others on the finality of bankruptcy confirmation orders. The strong public policy in favor of maximizing debtors' estates and facilitating successful reorganization, reflected in the Code itself, clearly weighs in favor of encouraging such reliance. Indeed, the importance of allowing approved reorganizations to go forward in reliance on bankruptcy court confirmation orders may be the central animating force behind the equitable mootness doctrine. Where, as here, investors and other third parties consummated a massive reorganization in reliance on an unstayed confirmation order that, explicitly and as a condition of feasibility, denied the claim for which appellate review is sought, the allowance of such appellate review would likely undermine public confidence in the finality of bankruptcy confirmation orders and make successful completion of large reorganizations like this more difficult. This is true regardless of whether the Investors' reliance was "reasonable" or based on a 30%, 60%, or 100% probability of success on appeal. . . .

*Continental,* 91 F.3d at 565 (citations omitted).

As previously noted, LGE was not an "outside investor" that could have chosen not to "walk away from the deal" without incurring substantial losses. Since insid-

---

noted that Zenith's figure would not be accurate if LGE's claims as a creditor of Zenith were recharacterized as equity. However, it is not clear that Appellants have challenged the Bankruptcy Court's refusal to disallow or

recharacterize LGE's claims. *See Zenith,* 241 B.R. at 107; Nordhoff's Opening Br. (filed as an appendix to its Opp'n Br. to Zenith's Mot. to Dismiss).

ers such as LGE will generally have financial incentives to take steps that facilitate successful reorganizations, it may be less necessary to adopt legal rules that "encourage" them to do so. Nevertheless, the Plan does substantially reduce Zenith's debt burden. And, it cannot be disputed that Zenith had been incurring substantial losses for many years, and that it would have had great difficulty meeting its obligations to creditors without a financial restructuring of some sort. Thus, while LGE does stand to benefit under the Plan, the Plan did facilitate a successful reorganization.

Further, the implementation of the Plan has affected LGE's operations—for example, it now owns and operates the television assembly plant in Reynosa, Mexico. These operations would likely be disrupted if the Plan were rejected by the Bankruptcy Court after a remand by this court. Thus, refusing to respect LGE's reliance on the unstayed confirmation order in this case would be contrary to the public policy of encouraging actions—by outsiders and investors alike—that facilitate successful reorganizations. Moreover, public policy is furthered by encouraging Zenith's customers, vendors, and employees to continue their relationships with Zenith in reliance on an unstayed confirmation order.

### 6. *Other Considerations*

As the above analysis indicates, each of the five *Continental* factors weighs in favor of dismissing these appeals. As such, this would seem to present a clear case for dismissal under the equitable mootness doctrine. But, although the court will dismiss the appeals, it does not do so without some hesitation. *See Continental,* 91 F.3d at 559 (noting that the doctrine should be cautiously applied).

#### a. The Nature of the Issues Raised on Appeal

First, the issues raised on appeal implicate the fundamental fairness of the manner in which the Plan was proposed and confirmed. The Plan was proposed by LGE, Zenith's majority shareholder. LGE controlled a majority of the members of Zenith's board of directors. Although a Special Committee of independent directors was appointed to negotiate with LGE, it appears that the Committee did not obtain a "fairness opinion." There is also some question as to whether the minority shareholders were afforded an opportunity to meaningfully participate in negotiations aimed at exploring alternatives to the Plan. *See Zenith,* 241 B.R. 92, 109 (noting that once PJSC determined that there was no equity in Zenith, asking the minority shareholders for input into the restructuring would have been futile). Both the Zenith board and the Bankruptcy Court appeared to rely heavily on valuations prepared by PJSC. The Court ultimately determined that PJSC had a conflict of interest arising from work it performed for LGE in relation to the proposed restructuring. Further, PJSC was apparently entitled to a "success fee" contingent upon confirmation of the Plan. Still, the Court relied heavily on the valuation testimony and report of PJSC in confirming the Plan.

In addition, the Bankruptcy Court granted Zenith's motion for an expedited confirmation hearing. The hearing was held one month after Zenith filed its bankruptcy petition. Nordhoff contends that this schedule did not afford it a fair opportunity to prepare and present its objections to the Plan. The Plan was largely consummated before Nordhoff or the Equity Committee had received a copy of the confirmation order. Zenith now seeks to preclude appellate review of the Plan.

Zenith contends that the "substance" of Nordhoff's appeal is irrelevant to the equitable mootness inquiry. The court does not agree. While the *merits* of the appeal may be irrelevant, the *substance* is not. Because the issues implicate the fairness of the process by which the Plan was proposed and confirmed, the court is somewhat reluctant to preclude appellate review of those issues.

However, to recognize that the issues implicate fairness concerns is not to prejudge the merits of those issues. Indeed, the Bankruptcy Court ultimately decided that the minority shareholders received the fair value of their shares—nothing. The Court was aware of PJSC's conflict of interest and fee arrangement, but concluded that its valuation was not tainted by those considerations. That conclusion may have been perfectly reasonable in light of the totality of the evidence before the Court.[18] Further, it appears that LGE has come to Zenith's rescue on at least two prior occasions—(1) in 1995, when Zenith solicited a substantial investment from LGE that raised its ownership interest from 5% to 58%; and (2) in 1997, when LGE provided Zenith with an additional $25 million to enable it to meet its obligations to bondholders. *See Zenith,* 241 B.R. at 96, 100. By proposing the Plan, LGE may have once again come to Zenith's rescue, providing substantial benefits to Zenith's creditors, customers, suppliers and employees.

Moreover, although there was only a short period of time between Zenith's filing and the confirmation hearing, Appellants do not dispute Zenith's contention that, prior to Zenith's filing, the minority shareholders (through an informal equity committee that included Nordhoff) were afforded the opportunity to review documents and to meet with Zenith's senior management and financial advisors. *See* Opening Br. at 3. Thus, despite the expedited proceedings in the Bankruptcy Court, Appellants cannot claim to have been denied a meaningful opportunity to engage their own experts or otherwise oppose the Plan.

### b. Resolution of Delaware Corporate Law Issues

Although this case comes before the court as a bankruptcy appeal, the essence of the appellants' claim is that the Plan was, in effect, a squeeze out merger engineered by LGE in violation of its fiduciary duties under Delaware corporate law. As a result of the Plan, Zenith's former majority shareholder now owns 100% of the company and the interests of the former minority shareholders were extinguished without compensation. Indeed, Nordhoff characterizes this case as "a dispute between two parties"—LGE and Zenith's former minority shareholders. Opp'n Br. at 15.

The Bankruptcy Court agreed with the Appellants' assertion that to pass muster under federal bankruptcy law, the Plan must satisfy the "entire fairness" standard under Delaware corporate law.[19] *See Zenith,* 241 B.R. at 108; *see also* 11 U.S.C. § 1129(a)(3) (requiring plan to be "proposed in good faith and not by any means forbidden by law"). If the court dismisses these appeals on equitable mootness grounds, the Bankruptcy Court becomes not only the final arbiter of federal bankruptcy law, but perhaps of Delaware corporate law as well.[20]

 While that result may be less than optimal, the court is not convinced that this concern outweighs the factors described above that weigh in favor of dismissing these appeals under the equitable mootness doctrine. As the *Continental* dissenters noted, the majority opinion affirmed the dismissal of the appeal in that case despite having recognized that the case raised "interesting and challenging

---

**18.** It appears that one of the Equity Committee's experts was also engaged under an outcome determinative fee arrangement. *See Zenith,* 241 B.R. at 102 n. 13; 5/22/00 Tr. at 30, 56–57, 87–88.

**19.** It is not clear whether Zenith concedes this point.

**20.** Disputes between majority and minority shareholders are within the special expertise of Delaware state courts. Nordhoff contends that unless the findings of the Bankruptcy Court are reversed, principles of *res judicata* and collateral estoppel may preclude it from bringing a breach of fiduciary duty claim against LGE in state court. The court recognizes this as a legitimate concern, but expresses no opinion as to how Delaware courts should apply those doctrines under these circumstances.

questions" of first impression. *See Continental*, 91 F.3d at 557; *id.* at 568 (dissenting opinion). If it is proper to apply the equitable mootness doctrine despite the presence of "interesting and challenging" issues of federal bankruptcy law, the presence of interesting and challenging state law issues should not preclude application of the doctrine.

## IV. SUMMARY AND CONCLUSION

Having considered and weighed the factors discussed above, the court is convinced that dismissal of these appeals on equitable mootness grounds is appropriate. In particular, the Appellants' failure to even seek a stay as the Plan was being substantially—if not entirely—consummated outweighs the court's concerns identified above.[21] Accordingly, the court will grant Zenith's motion to dismiss these appeals. An appropriate order shall be issued in conjunction with this opinion.

---

**21.** In *Continental,* the dissenters expressed concern with what they felt amounted to the retroactive application of a rule requiring appellants to obtain a stay in order to challenge an order confirming a plan a reorganization. *See Continental,* 91 F.3d at 572 (dissenting opinion). Although, as the dissenters acknowledged, the majority in *Continental* did not adopt such a *per se* rule, that case certainly put future appellants on notice of the possible consequences of failing to obtain a stay.